IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-02857-PAB-KLM

AMG NATIONAL CORP., a Colorado Corporation, and
AMG NATIONAL TRUST BANK,

      Plaintiffs,

v.

DAVID M. WRIGHT, and
KELLY L. WRIGHT,

      Defendants.

---

## ORDER

---

This matter comes before the Court on plaintiffs' Motion for Default Judgment [Docket No. 18].  The Court has jurisdiction pursuant to 18 U.S.C. § 1332.

## I.  BACKGROUND

David Wright ("Mr. Wright") is the former President of Finance and a director of AMG National Trust Bank (the "Bank"), a commercial bank wholly owned by AMG National Corporation (the "Corporation"; collectively, "AMG").  Docket No. 1 at 1, ¶ 1. Mr. Wright is also the former President and Chief Executive Officer ("CEO") of the Corporation, as well as one of its directors.  *Id.*  Mr. Wright and his wife Kelly Wright ("Ms. Wright") are citizens of Washington.  *Id.* at 2, ¶¶ 4-5.  Plaintiffs are citizens of Colorado.  *Id.* at 1-2, ¶¶ 2-3.  As part of his employment, Mr. Wright executed two agreements: an employee agreement and a director agreement.  *Id.* at 2, 4 ¶¶ 9, 16. On February 1, 2013, Mr. Wright signed a Confidential Information and Employee

Agreement (the "employee agreement"), which requires Mr. Wright to, *inter alia*, "protect confidential and other proprietary AMG information."  *Id.* at 2-3, ¶¶ 9-10.  The agreement also contains a clause preventing Mr. Wright from disparaging plaintiffs.  *Id.* at 4, ¶ 14.  Disparage is not defined in the employee agreement besides stating that Mr. Wright "agrees not to criticize, disparage, or speak adversely about AMG . . . ."  Docket No. 2-1 at 6-7, ¶ 9.

On March 29, 2004, Mr. Wright signed an Agreement Regarding Director Duties and Confidentiality (the "director agreement") that prevented Mr. Wright from disclosing confidential information, subject to certain exclusions.  Docket No.1 at 4-5, ¶¶ 16, 18.  The director agreement makes Mr. Wright liable for damages arising from the disclosure of confidential information if the disclosures were made by him.  *Id.* at 5, ¶ 19.  The director agreement defines confidential information as any information (1) identified as confidential, (2) relating to AMG's trade secrets, (3) relating to AMG's clients, (4) concerning the existence of a possible relationship between AMG and a third party, or (5) on notes or other documents that reflect the above information.  Docket No. 2-2 at 2, ¶ 3.

On April 25, 2016, Mr. Wright retired from the Bank and his board positions.  Docket No. 1 at 5, ¶ 22.  After retiring, Mr. Wright created and published a publicly accessible website with posts that disparage plaintiffs and reveal confidential information.  *Id.* at 6-7, ¶¶ 24, 32.  Ms. Wright assists Mr. Wright in maintaining the content on the website.  *Id.* at 7, ¶ 31.  In addition, on August 16, 2019, plaintiffs learned from a client that Mr. Wright's LinkedIn page contained a lengthy attack of plaintiffs; Mr.

Wright's LinkedIn pages has "nearly constantly maintained postings" criticizing plaintiffs and revealing confidential information.  *Id.*, ¶¶ 34-35.

Defendants have not restricted their activities to the internet; beginning in October 2019, Mr. Wright began leaving voicemail messages for Bank employees accusing current Bank employees of criminal activities, incompetence, venereal diseases, marital infidelities, and directing the employees to his website to view materials disparaging plaintiffs.  *See, e.g.*, *id.* at 8-9, ¶¶ 38-50.  Ms. Wright has also made calls to Bank employees, including leaving a voicemail where she indicated that she was owed $30,000,000 in part because plaintiffs caused her to have a miscarriage. *Id.* at 9, ¶ 47.  Mr. Wright's voicemails included demands for payment of $50,000,000 "tax free."  *Id.*, ¶ 45.  On September 12, 2019, the Arapahoe County Court entered a permanent civil protection order against Mr. Wright barring him from contacting plaintiffs' employees, their families, their clients, and any business affiliates, but Mr. Wright has ignored this order.  *Id.*, ¶ 51.  Mr. Wright has contacted plaintiffs' business affiliates and potential clients and disparaged plaintiffs and directed the potential clients to his website.  *Id.* at 9-10, ¶¶ 53-56.  In addition, Mr. Wright demanded $2,000,000 from employees of one of plaintiffs' business affiliates in a LinkedIn message.  *Id.* at 10, ¶ 55.

Plaintiffs bring six claims: (1) breach of contract – the employee agreement – against Mr. Wright; (2) breach of contract – the director agreement – against Mr. Wright; (3) defamation against Mr. Wright and Ms. Wright; (4) commercial/product disparagement against Mr. Wright; (5) intentional interference with business relations against Mr. Wright; and (6) civil conspiracy against Mr. Wright and Ms. Wright.  *Id.* at 10-13.  For remedies, plaintiffs seek damages and injunctive relief.  *Id.* at 14.

Defendants have not entered an appearance in this lawsuit.  On January 12, 2021, the Clerk of Court entered default against defendants.  Docket No. 16.

## II.  LEGAL STANDARD

In order to obtain a judgment by default, a party must follow the two-step process described in Fed. R. Civ. P. 55.  First, the party must seek an entry of default from the Clerk of the Court under Rule 55(a).  Second, after default has been entered by the Clerk, the party must seek judgment under the strictures of Rule 55(b).  *See Williams v. Smithson*, 57 F.3d 1081, 1995 WL 365988, at *1 (10th Cir. June 20, 1995) (unpublished table decision) (citing *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)).

The decision to enter default judgment is "committed to the district court's sound discretion."  *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003) (citation omitted).  In exercising that discretion, the Court considers that "[s]trong policies favor resolution of disputes on their merits."  *Ruplinger v. Rains*, 946 F.2d 731, 732 (10th Cir. 1991) (quotation and citations omitted).  "The default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Id.*  It serves to protect plaintiffs against "interminable delay and continued uncertainty as to his rights."  *Id.* at 733.  When "ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment."  *Seme v. E&H Prof'l Sec. Co., Inc.*, No. 08-cv-01569-RPM-KMT, 2010 WL 1553786, at *11 (D. Colo. Mar. 19, 2010).

A party may not simply sit out the litigation without consequence.  *See Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444-45 (10th Cir.

1983) ("[A] workable system of justice requires that litigants not be free to appear at their pleasure.  We therefore must hold parties and their attorneys to a reasonably high standard of diligence in observing the courts' rules of procedure.  The threat of judgment by default serves as an incentive to meet this standard.").  One such consequence is that, upon the entry of default against a defendant, the well-pleaded allegations in the complaint are deemed admitted.  *See* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2688.1 (4th ed., 2020 rev.).  "Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  *Id*.  A court need not accept conclusory allegations.  *Moffett v. Halliburton Energy Servs., Inc.* 291 F.3d 1227, 1232 (10th Cir. 2002).  Although "[s]pecific facts are not necessary" in order to state a claim, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (quotation and citation omitted).

## III.  ANALYSIS

### A.  Personal Jurisdiction

Before addressing the merits of plaintiffs' motion for default judgment, the Court must determine whether it has jurisdiction over the defendants.  *See Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997) ("[A] district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case.").

#### 1.  Service of Process

Proper service is a jurisdictional prerequisite to litigation.  *Jenkins v. City of Topeka*, 136 F.3d 1274, 1275 (10th Cir. 1998) ("Effectuation of service is a precondition to suit.").  Without proper service, the Court lacks personal jurisdiction over defendants.  *Okla. Radio Assocs. v. Fed. Deposit Ins. Co.*, 969 F.2d 940, 943 (10th Cir. 1992).

On November 24, 2020, plaintiffs filed a proof of service of summons and complaint, indicating that plaintiffs had been unable to personally serve defendants but had completed service in compliance with Wash. Rev. Code § 4.28.080(16)-(17).  *See* Docket No. 10 at 1-2.  Fed. R. Civ. P. 4(e)(1) allows service to be made "following state law" for either the state where the forum court is located (here, Colorado)[1] or the state where service is made (here, Washington).  Plaintiffs bear the burden of proving that service of process is sufficient.  *Fed. Deposit Ins. Co. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992).  Under Wash. Rev. Code § 4.28.080(16)-(17),

---

[1] Plaintiffs make no argument that they completed service on defendants under the laws of Colorado, *see generally* Docket No. 10; *see* Docket No. 18 at 2, ¶ 5, and the Court accordingly does not consider the issue.

(16) In all other cases, to the defendant personally, or by leaving a copy of the summons at the house of his or her usual abode with some person of suitable age and discretion then resident therein.

(17) where the person cannot with reasonable diligence be served as described, the summons may be served as provided in this subsection, and shall be deemed complete on the tenth day after the required mailing: By leaving a copy at his or her usual mailing address with a person of suitable age and discretion who is a resident, proprietor, or agent thereof, and by thereafter mailing a copy by first-class mail, postage prepaid, to the person to be served at his or her usual mailing address.

"Reasonable diligence requires the plaintiff to make honest and reasonable efforts to locate the defendant.  But reasonable diligence does not require the plaintiff to employ all conceivable means to locate the defendant."  *Wright v. B&L Props., Inc.*, 53 P.3d 1041, 1045 (Wash. App. 2002) (internal citations omitted).  Under Washington law, a "usual mailing address" must mean "some level of actual use for the receipt of mail or arrangements contemplating an actual use for receiving and forwarding mail." *Goettemoeller v. Twist*, 253 P.3d 405, 408 (Wash. Ct. App. 2011).

Plaintiffs state that they made multiple attempts in 2019 and 2020 to serve Mr. Wright in connection with a civil protection order issued in Arapahoe County Court, including with the assistance of the King County, Washington sheriff.  Docket No. 10 at 2, ¶ 5.  These attempts at service were made at 9176 Holman Road NW, Unit No. 231, Seattle, Washington 98117, which is located in an apartment building named Parla Apartments.  *Id.* at 2, ¶¶ 5-6.  Parla Apartments has "secured access with underground parking, and only uniformed package deliverers or law enforcement officers may be permitted inside."  *Id.*

On November 13, 2020, a process server went to the building and left the complaint and summons for this case with the leasing agent of the apartment building.

Docket No. 10-4.  After this, plaintiffs mailed the summons and complaint to defendants at the same address.  *See* Docket No. 10-5.  Plaintiffs state that the Parla Apartments address is defendants' residential address because it is the address provided for Mr. Wright's retirement account and voter registration and because AMG has successfully mailed documents to Mr. Wright at this address as recently as October 28, 2020. Docket No. 10 at 1, ¶ 2; *see also* Docket Nos. 10-1, 10-2.

The Court finds this is sufficient to establish service of process on Mr. Wright. Plaintiffs detail attempts to serve Mr. Wright at this address over the years and the fact the Mr. Wright received mail at this address after the complaint in this case had been filed.  This shows both reasonable diligence and that this is Mr. Wright's usual mailing address.  *See Narin v. Abubakar,* 11 Wash. App. 2d 1018, 2019 WL 5951424, at *8 (Wash. Ct. App. 2019) (finding that "the only reasonable conclusion is that his usual mailing address" was the same as his residential address when there were no facts indicating otherwise).

However, plaintiffs do not provide any reason for why this address is Ms. Wright's address besides the fact that they are married.  *See* Docket No. 10 at 1, ¶ 2. Additionally, the fact that they are married is asserted in the complaint "[o]n information and belief."  *See* Docket No. 1 at 2, ¶ 5.  Plaintiffs provide no information on attempts made to locate Ms. Wright's address or to serve her at Parla Apartments.  *See* Docket No. 10 at 1-2.  Each of the attempts at service in 2019 and 2020 were for lawsuits directed only at Mr. Wright, and the link to Parla Apartments as a mailing address is only established with respect to Mr. Wright.  *See* Docket No. 10 at 2, ¶ 5; Docket Nos. 10-1, 10-2.  Plaintiffs provide no information on why the Parla Apartments address

8

would be Ms. Wright's "usual mailing address" or how they exercised reasonable diligence to personally serve her.  Accordingly, the Court finds that the attempted service on Ms. Wright does not comply with Wash. Rev. Code § 4.28.080(17). Generally, "when a court finds that service is insufficient but curable, it generally should quash the service and give the plaintiff an opportunity to re-serve the defendant." *See Gregory v. U.S. Bankr. Ct.,* 942 F.2d 1498, 1500 (10th Cir. 1991) (quoting *Pell v. Azar Nut Co.,* 711 F.2d 949, 950 n. 2 (10th Cir. 1983)).  Therefore, within 30 days of the entry of this order, plaintiffs may attempt to serve Ms. Wright pursuant to Fed. R. Civ. P. 4.

### 2. Due Process

Because the Court finds that service of process was proper on Mr. Wright, the Court next considers whether the exercise of jurisdiction over him comports with due process.  "In determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process."  *Niemi v. Lasshofer*, 770 F.3d 1331, 1348 (10th Cir. 2014); *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006) (quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000)).  The Colorado long-arm statute, Colo. Rev. Stat. § 13-1-124, has been construed to extend jurisdiction to the full extent permitted by the Constitution, so the jurisdictional analysis here reduces to a single inquiry of whether jurisdiction offends due process.  *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008); *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo.

9

2005).  Personal jurisdiction comports with due process where a defendant has

minimum contacts with the forum state and where those contacts are such that

assuming jurisdiction does not offend "traditional notions of fair play and substantial

justice."  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).  Minimum contacts may be

established under the doctrines of general jurisdiction or specific jurisdiction.

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state . . . and does not require that the claim be related to those contacts.  Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo:* in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

*Dudnikov*, 514 F.3d at 1078.  Courts typically make three inquiries to determine if a

state's exercise of sovereignty over a defendant can be described as fair and just for

specific jurisdiction: "(1) whether the defendant purposefully directed its activities at

residents of the forum state; (2) whether the plaintiff's injury arose from those

purposefully directed activities; and (3) whether exercising jurisdiction would offend

traditional notions of fair play and substantial justice."  *Newsome v. Gallacher*, 722 F.3d

1257, 1264 (10th Cir. 2013).  "[W]here, as here, the [motion for default judgment] is

determined on the basis of the pleadings and affidavits, that burden may be met by a

prima facie showing."  *Sharpshooter Spectrum Venture, LLC v. Consentino,* No. 09-cv-

0150-WDM-KLM, 2011 WL 3159094, at *2 (D. Colo. July 26, 2011) (citing *Shrader v.*

*Biddinger,* 633 F.3d 1235, 1239 (10th Cir. 2011)).  In this case, Mr. Wright made the

statements giving rise to this action to employees of plaintiffs.  Both plaintiffs are

Colorado citizens.[2]  Plaintiffs' injuries arise from these statements and actions that Mr. Wright directed towards plaintiffs while plaintiffs were in Colorado.  Thus, the first two criteria are met.

Regarding "traditional notions of fair play and substantial justice," courts consider:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies.

*Dudnikov,* 514 F.3d at 1080 (citation omitted).  The Court finds that, under these factors, personal jurisdiction over Mr. Wright does not offend traditional notions of fair play and substantial justice.  First, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern."  *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212-13 (10th Cir. 2000) (citations and quotations omitted).  The Court does not find this to be such a case where the burden on Mr. Wright rises to a constitutional

---

[2] Under 28 U.S.C. § 1348, "[a]ll national banking associations shall, for the purposes of all . . . actions by or against them, be deemed citizens of the States in which they are respectively located."  "[A] national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located."  *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006).  The Court takes judicial notice of the Office of Comptroller, which states that plaintiff AMG National Trust Bank is a national bank located in Boulder Colorado.  *See National Banks Active As Of 8/31/2021*, Off. of the Comptroller of the Currency (Aug. 31, 2021), https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf; *see also Khan v. Bank of N.Y. Mellon*, 525 F. App'x 778, 780 (10th Cir. 2013) (unpublished) (taking judicial notice of the national banks list issued by the Office of the Comptroller, holding that the national bank was a citizen of the location given in the Office of Comptroller list, and rejecting argument that a national bank that was a wholly owned subsidiary had the citizenship of its parent company).  The Corporation is incorporated and has its principal place of business in the state of Colorado.  Docket No. 1 at 1, ¶ 2.  Accordingly, both plaintiffs are Colorado citizens.

concern.  Second, "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors."  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1096 (10th Cir. 1998).  The third factor "hinges on whether the [p]laintiff may receive convenient and effective relief in another forum," *Benton v. Cameco Corp.,* 375 F.3d 1070, 1079 (10th Cir. 2004), and the fourth factor asks "whether the forum state is the most efficient place to litigate the dispute." *Id.* at 1080 (quotations and citation omitted).  In this case, plaintiffs could receive effective relief in Washington, albeit less conveniently.  However, Colorado is the most efficient forum to litigate this dispute because plaintiffs are citizens of Colorado, the alleged injury was directed at plaintiffs in Colorado, and Mr. Wright is out-of-state and has not responded to the complaint or motion for default judgment.  The fifth factor "focuses on whether the exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign nations."  *Id.* (quotation marks omitted).  Both the employee agreement and director agreement state that they are governed by Colorado law.  *See* Docket No. 2-1 at 8, ¶ 15; Docket No. 2-2 at 3, ¶ 12.  Accordingly, the Court finds that exercising personal jurisdiction over Mr. Wright does not offend traditional notions of fair play and substantial justice, and that the Court has specific personal jurisdiction over Mr. Wright.

### B.  Breach of Contract – the Employee Agreement

#### 1.  Elements of Breach of Contract Claim

Plaintiffs' first claim is for breach of contract due to Mr. Wright's alleged breach of the confidentiality and non-disparagement clauses of the employee agreement.  Docket No. 1 at 10-11, ¶¶ 60-64.  Under Colorado law, "a party attempting to recover on a claim

for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).  Plaintiffs allege that Mr. Wright signed an employee contract on February 1, 2013, Docket No. 1 at 2, ¶ 9, that requires Mr. Wright to, *inter alia*, "protect confidential and other proprietary AMG information."  *Id.*, ¶ 10.  The agreement also contains a non-disparagement clause which states that Mr. Wright

> agrees to not criticize, disparage, or speak adversely about AMG or its shareholders, officers, directors, employees, or clients (each a "Related Party"), or make any communication, whether oral, written, or otherwise, to any person or entity that has the effect of damaging the professional or personal reputation of, or that otherwise could work to the detriment of AMG or a Related Party.  [Mr. Wright] agrees to not originate, disclose, or otherwise be the source of any negative information about AMG or a Related Party, whether oral, written, or otherwise.  [Mr. Wright] acknowledges that AMG actively enforces this provision through advanced web searches and other means.  Employee transfers to AMG any Employee copyright on any web or other published content about AMG or any Related Party other than Employee[.]

*Id.* at 4, ¶ 14.

Mr. Wright signed this agreement while an employee of AMG, *see id.* at 2, ¶¶ 8-9, and left his position with AMG in 2016.  *Id.* at 5, ¶ 22.  However, these prohibitions on disclosing confidential information and disparaging AMG continue after an employee leaves AMG.  *See* Docket No. 2-1 at 1, 6-7 ¶ 1, 9-10 ("This Agreement shall survive termination of Employee's employment with AMG.").  The employee agreement's definition of confidential information "includes, without limitation" "all information about AMG clients."  *Id.* at 2, ¶ 2(a)(i).  After Mr. Wright left AMG, he created a website that,

*inter alia*, published the names of clients and their personal information[3] and disparaged plaintiffs. [4]  *See* Docket No. 1 at 6-7, ¶¶ 24-33.  This violates the terms of his employee agreement.[5]

### 2.  *Enforceability of Employee Agreement*

The Court next considers whether enforcing the employee agreement comports with Colorado's public policy.  A contract in contravention of public policy is void and unenforceable.  *Pierce v. St. Vrain Valley Sch. Dist. RE–1J,* 981 P.2d 600, 604 (Colo. 1999).  In *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1133-35 (10th Cir. 2003) (hereinafter *Harvey I*), the Tenth Circuit considered a breach of contract claim under Colorado law for the disclosure of confidential information that did not rise to the level of trade secrets.  The defendants, former employees, had signed an agreement stating the employee, *inter alia*, "shall not at any time or in any way during the term of this Agreement *or after its termination*, divulge, disclose or communicate to any person or

---

[3] Plaintiffs do not specifically allege that Mr. Wright obtained this information through his employment.  *See generally* Docket No. 1.  However, the employee agreement states that confidential information is "all information obtained from or through AMG, about or affecting AMG, or otherwise arising out of or in connection with [Mr. Wright's] employment with AMG" except for "information that is knowledge of the general public and was made public other than through [Mr. Wright's] or another person's unauthorized actions."  Docket No. 2-1 at 2, ¶ 2(a).  Because plaintiffs allege that the information is confidential and that Mr. Wright violated that provision of the employee agreement, the complaint is reasonably read to allege that Mr. Wright obtained it as a result of his employment.

[4] The complaint does not state when Mr. Wright created and first posted to the website, beyond stating that it was after he left AMG.  *See* Docket No. 1 at 5-7, ¶¶ 22-33.

[5] The complaint contains other examples of Mr. Wright's failure to abide by the employee agreement after he left AMG, *see* Docket No. 1 at 6-7, ¶¶ 24-33, which the Court finds are also well pled.

organization in any manner whatsoever any information concerning any matters affecting or relating to the business and trade secrets of [plaintiff]." *Id.* at 1133 (emphasis added).

The district court granted summary judgment in favor of the defendants, finding that the provision prohibiting the disclosure of confidential information was a disguised restrictive covenant. *Id.* at 1134. The Tenth Circuit reversed, stating that the "confidentiality and non-disclosure agreements at issue could not be characterized as restrictive covenants because they 'serve entirely different purposes than do agreements not to compete and must be analyzed on the basis of those distinct purposes alone.'" *Id.* (quoting *MAI Basic Four, Inc. v. Basis, Inc.,* 880 F.2d 286, 288 (10th Cir. 1989)).[6] Accordingly, the Court finds that to enforce the confidentiality provision of the employee agreement post termination does not violate Colorado public policy. *See id.* (barring disclosure of confidential information "is different from a blanket covenant not to compete"); *see also Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1254, 1261 (D. Colo. 2005) (applying Colorado law and granting preliminary injunction in favor of company seeking to enforce agreement that prohibited former employee from working at a competitor within eighteen months of leaving the company and from ever disclosing company's confidential information); *Taxman LLC v. Birch*, 2016 Colo. Dist. LEXIS 2041, at *5 (Colo. Dist. Feb. 28, 2019) (permanently enjoining defendants from "using in any manner any non-public, proprietary or confidential information or trade secrets, including client identification information").

---

[6] The Tenth Circuit acknowledged that *MAI Basic* involved a contract dispute in New Mexico, but found it equally applicable to the breach of contract claim under Colorado law. *Harvey I*, 338 F.3d at 1134 n.12.

After the Tenth Circuit remand in *Harvey I*, the jury found that defendants breached the confidentiality provision and the district court granted a permanent injunction in favor of the plaintiffs. *Harvey Barnett, Inc. v. Shidler*, 200 F. App'x 734, 736 (10th Cir. 2006) (unpublished) (hereinafter *Harvey II*). The parties cross-appealed. *Id.* The Tenth Circuit rejected defendant's argument that, because she had not been found guilty of misappropriating trade secrets, she could not have breached the confidentiality clause. *Id.* at 740-41. The employment agreement contained a provision stating that the defendant acknowledged that she had received confidential information; the court found this sufficient to support a reasonable jury's finding that the defendant received confidential information. *Id.* at 738-39. In this case, the employee agreement states that Mr. Wright "necessarily will have access to and may create and/or obtain confidential information during [Mr. Wright's] employment, which is for the benefit of AMG and its clients." Docket No. 2-1 at 2, ¶ 2(c). The Court finds this sufficient to establish that Mr. Wright received confidential information while an employee of AMG. *Cf. Mulei v. Jet Courier Serv., Inc.,* 739 P.2d 889, 892-93 (Colo. App. 1987) ("confidential information acquired during the course of employment may be protected" and "[t]he determination of what constitutes 'confidential information' is a question for the trier of fact."), *rev'd on other grounds by Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486 (Colo. 1989).

Plaintiffs also seek to enforce the non-disparagement provision of the employee agreement. *See* Docket No. 18 at 2-3, ¶ 7. In *Pierce*, 981 P.2d at 601, the Colorado Supreme Court upheld the enforceability of an agreement that, *inter alia*, barred disparaging remarks. The plaintiff, a former school superintendent, resigned and

entered into a settlement agreement with the school district that, among other things, stated that he and the school district mutually agreed not to make "disparaging public comments or remarks." *Id.* The plaintiff contended the school district violated the terms of the settlement; the school district argued that the portion of the agreement prohibiting disparaging comments was unenforceable because it violated public policy. *Id.* at 602. The court evaluated the settlement agreement under the strictures of contract law and held that, "in the absence of specific legislative direction to the contrary, we agree with [plaintiff] that the agreement in this case did not contravene the public policy of Colorado." *Id.* at 604. Accordingly, the Court finds that enforcing the non-disparagement clause of the employee agreement does not violate Colorado public policy. *See also EEOC v. Montrose Mem'l Hosp.*, 264 F. Supp. 3d 1102, 1106-07 (D. Colo. 2017) (denying EEOC's motion to find, *inter alia*, non-disparagement clause of settlement agreement void as against public policy because it was "not vague[ or] overly broad"); *cf. Cooper Tire & Rubber Co. v. Farese,* 423 F.3d 446, 456-58 (5th Cir. 2005) (holding that the mere fact that a non-disparagement clause could conceivably be used to hide illegality did not render it void as illegal or contrary to public policy).[7]

These posts have caused plaintiffs reputational damage and lost business opportunities, and have caused plaintiffs to expend time and resources on this matter. Docket No. 1 at 10, ¶ 58. Plaintiffs have not breached the agreement. *Id.*, ¶ 61. The well pled allegations of the complaint establish the existence of the employee contract, performance on the contract by plaintiffs, failure to perform on the contract by Mr.

---

[7] The Court finds that these provisions are enforceable in this section. The Court addresses the scope of the relief sought, a permanent injunction and damages, below.

Wright, and damages to plaintiffs.  Accordingly, plaintiffs state a claim for breach of the employee contract and are entitled to default judgment on this claim.

### C. Breach of Contract – the Director Agreement

Plaintiffs allege that Mr. Wright signed the director agreement on March 29, 2004, when he was an employee of AMG.  *Id.* at 2, 4-5, ¶¶ 8, 16, 22.  The director agreement contains provisions that prevent Mr. Wright from disclosing confidential information, subject to certain exclusions.  *Id.* at 4-5, ¶¶ 16, 18.  The director agreement makes Mr. Wright liable for damages arising from his disclosure of confidential information.  *Id.* at 5, ¶ 19.  The director agreement's definition of confidential information includes "any information relating to the trade secrets of the Company (including without limitation all asset allocation model research and computer models, client, customer, employee and personnel information[)] . . . ."  *Id.* at 4, ¶ 17.  Accordingly, Mr. Wright's disclosure of client information was a failure to perform on the contract. [8]  *See, e.g.*, *id.* at 7, ¶ 29 (Mr. Wright named "clients, employees, former employees, and affiliates of the Bank and personal information about them, including birthdates and home addresses.").

For the reasons given above, the Court finds that enforcement of the director agreement is not contrary to public policy.  *See supra* Section III.B.2.  Additionally, the well pled facts establish the existence of the director contract, *see* Docket No. 2-2, that plaintiffs performed on the contract, *see* Docket No. 1 at 11, ¶ 70, that Mr. Wright breached the contract by disclosing confidential information, *see id.* at 7, ¶ 29, and that

---

[8] The complaint contains other examples of Mr. Wright's failure to abide by the director agreement, *see* Docket No. 1 at 6-7, ¶ 24-33, which the Court finds are also well pled.

plaintiffs have been damaged as a result.  *See id.* at 10, 11, ¶¶ 58, 72.  These facts meet the elements to plead a breach of contract claim in Colorado.  *See W. Distrib. Co. v.*, 841 P.2d at 1058.  Therefore, plaintiffs are entitled to a default judgment on this claim.

### D.  Defamation

Plaintiffs bring a defamation claim against Mr. Wright and Ms. Wright.  The Court has determined that it does not have personal jurisdiction over Ms. Wright, *see supra* Section III.A.1, and accordingly will deny the motion for default judgment without prejudice as to the claim against her.  Therefore, the Court only considers whether plaintiffs have sufficiently pled a defamation claim against Mr. Wright.

Under Colorado law, the elements of defamation are: "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication."  *McIntyre v. Jones*, 194 P.3d 519, 523-24 (Colo. App. 2008) (quoting *Williams v. Dist. Ct.*, 866 P.2d 908, 911 n.4 (Colo. 1993)).  A statement is defamation per se if it imputes, *inter alia*, a criminal offense or "a matter incompatible with the individual's business, trade, profession, or office."  *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004).

However, certain constitutional protections apply.  If a statement involves a matter of public concern or pertains to a public official, then additional criteria must be met.  *See McIntyre*, 194 P. 3d at 524.  In this case, the Court finds that the statements are not a matter of public concern and plaintiffs are not public officials.  Additionally, "in

general, a statement of opinion, as opposed to a statement of fact, will be protected expression under the First Amendment." *Teilhaber Mfg. Co. v. Unarco Materials Storage, a Div. of Unarco Indus., Inc.*, 791 P.2d 1164, 1167 (Colo. App. 1989). However, an opinion may still support a defamation claim if "the language is defamatory and the underlying defamatory facts which provide a basis for the opinion are false and are not disclosed in context." *Id.* (citing *Burns v. McGraw–Hill Broad. Co., Inc.,* 659 P.2d 1351 (Colo. 1983).

The complaint alleges that Mr. Wright published statements on his publicly accessible website "graphically alleging sexual improprieties, alleging the Chairman is a 'serial killer' responsible for multiple murders, and alleging the Bank's current Chief Executive Officer and General Counsel failed to report elder abuse and made 'a series of false claims designed to kill [Mr. Wright's] family through siege and misrepresentations.'"[9]  Docket No. 1 at 7, ¶¶ 30, 32.  These statements are defamatory per se because they accuse plaintiffs of criminal offenses.  *See Gordon*, 99 P.3d at 79. Mr. Wright published these statements on his publicly accessible website with the intent to harm plaintiffs or, in the alternative, knew or should have known that the publishing of false statements would harm plaintiffs.  *Id.* at 12, ¶ 82.  Additionally, plaintiffs plead that the statements are false.  *See id.*

Accordingly, the well pled facts of the complaint establish that Mr. Wright published defamatory per se statements with the intent to harm plaintiffs, which states a

---

[9] The complaint contains other examples of Mr. Wright's publication of defamatory statements on his website and LinkedIn page, *see* Docket No. 1 at 6-7, ¶ 24-36, which the Court finds are also well pled.

cause of action for defamation.  Therefore, the Court will enter default judgment on this claim against Mr. Wright.

### E.  Commercial/Product Disparagement

Plaintiffs bring a claim against Mr. Wright for "commercial/product disparagement."  *Id.* at 12-13, ¶ 84-89.  A commercial disparagement claim under Colorado law contains the following elements: "(1) a false statement, (2) published to a third party, (3) derogatory to the plaintiff's business in general . . . or its quality, and (4) through which the defendant intended to cause harm to the plaintiff's pecuniary interest, or either recognized or should have recognized that it was likely to do so; (5) with malice; (6) thus, causing special damages."  *Exam. Bd. of Prof. Home Inspectors v. Int'l Assoc. of Certified Home Inspectors*, No. 18-cv-01559-RBJ, -- F. Supp. 3d --, 2021 WL 492482, at *15 (D. Colo. Feb. 10, 2021) (quoting *Teilhaber*, 791 P.2d at 1166).  The constitutional protection afforded to defamation defendants also applies in the disparagement context; accordingly, "a statement of opinion . . . will be protected expression" unless "the language is defamatory and the underlying defamatory facts which provide a basis for the opinion are false and are not disclosed in context."  *Teilhaber*, 791 P.2d at 1167.

For the reasons given above, plaintiffs have established that Mr. Wright has published false statements that were intended to cause harm or that Mr. Wright should have recognized they would likely do so.  The statements published by Mr. Wright are derogatory of plaintiffs' business, *see, e.g.*, Docket No. 1 at 7, ¶ 29 (describing Mr. Wright's website's allegations of incompetence and malfeasance by plaintiffs'

employees), and plaintiffs have alleged that Mr. Wright made them with malice.  *Id.* at 12, ¶ 88.

To show special damages, "a plaintiff usually must identify those persons who refuse to purchase his product because of the disparagement."  *Teilhaber*, 791 P.2d at 1167.  However, "[i]f it is not a practical possibility to show specific losses, damages may then be proved by evidence similar to that used to prove lost profits resulting from a breach of contract."  *Id.* at 1168.  Plaintiffs have neither identified persons who refused to do business with them because of the disparagement nor attempted to prove lost profits by another means.  Accordingly, they have not established special damages, and the Court will not grant default judgment on the commercial/product disparagement claim.

### F.  Intentional Interference with Business Relations

Plaintiffs allege that Mr. Wright committed the tort of intentional interference with business relations by contacting potential and existing clients, affiliates, and consumers of AMG and directing them to his defamatory website, as well as by disparaging AMG to them.  Docket No. 1 at 13, ¶ 91.  Plaintiffs' allegations implicate both current and prospective business relations.  A claim for tortious interference with current business relations requires plaintiffs to show that the defendant "(1) was aware of the existence of the contract; (2) intended that one of the parties breach the contract; (3) induced the party to breach the contract or make it impossible for him or her to perform; and (4) acted 'improperly' in causing the breach."  *Hertz v. Luzenac Grp.,* 576 F.3d 1103, 1118 (10th Cir. 2009) (citing *Krystkowiak v. W.O. Brisben Cos.,* 90 P.3d 859, 871 (Colo. 2004)); *see also MDM Grp. Assocs., Inc. v. CX Reinsurance Co.,* 165 P.3d 882, 886

(Colo. App. 2007) ("a defendant cannot be liable for interference with its own contract").

Because there must be a breach of a contract between plaintiffs and a third-party, "[i]f

the contract has been fully performed, then there has been no interference." *Id.*

Plaintiffs allege that Mr. Wright's communications have cause "lost business

opportunities and waste of time and resources[,]" Docket No. 1 at 13, ¶ 93, but make no

allegations that any third parties breached contracts with plaintiffs as a result of Mr.

Wright's statements.  Accordingly, plaintiffs have not met the elements of intentional

interference with a current business relation.

Plaintiffs' claim also alleges that Mr. Wright's actions intended to interfere with

AMG's relations with "potential affiliates, clients, and consumers," *id.* at 13, ¶ 92, which

implicates tortious interference with prospective business relations.  Tortious

interference with prospective business relations requires essentially the same elements

as with current business relations, except that it does not require an existing contract.

*MDM Grp.,* 165 P.3d at 886.  "[T]here must be a showing of improper and intentional

interference by the defendant that prevents the formation of a contract between the

plaintiff and a third party."  *Id.*  This showing must be "a reasonable likelihood or

reasonable probability that a contract would have resulted."  *Id.*  Plaintiffs' vague

assertions that they lost business opportunities due to Mr. Wright's statements do not

show that there was a reasonable likelihood that a contract would have resulted;

instead, they are a "mere hope," which will not suffice.  *See Hertz*, 576 F.3d at 1119.

Therefore, plaintiffs have not met the elements of intentional interference with

prospective business relations.

## G.  Civil Conspiracy

Plaintiffs' final claim is a claim against both Mr. Wright and Ms. Wright for civil conspiracy.

> To establish a claim for civil conspiracy, a plaintiff must show by a preponderance of the evidence that there exists: (1) an object to be accomplished; (2) an agreement by two or more persons on a course of action to accomplish that object; (3) in furtherance of that course of action, one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal; and (4) damages to the plaintiff as a proximate result.

*Fifth Third Bank v. Morales*, No. 16-cv-01302-CMA-STV, 2017 WL 6492108, at *6 (D. Colo. Dec. 19, 2017) (citing *Magin v. DVCO Fuel Sys., Inc.*, 981 P.2d 673 (Colo. App. 1999)).  The complaint alleges that Mr. Wright and Ms. Wright[10] had an agreement to try to obtain tens of millions of dollars from plaintiffs through

> [e]ngag[ing] in at least one unlawful overt act, to wit, engaging in criminal extortion by making substantial threats to cause economic hardship to AMG's officials and employees, attempting bank robbery by trying to obtain substantial sums of money from AMG through a campaign of intimidation of its officials and employees, violating the Hobbs Act by obstructing or otherwise affecting AMG's interstate commercial financial services, and/or defaming AMG in violation of the criminal laws of at least one state in which AMG conducts business.

Docket No. 1 at 13, ¶¶ 95-96.  The Court has already determined that plaintiffs have pled sufficient facts, accepted as true, to find that Mr. Wright defamed plaintiffs.  *See supra* Section III.D.  The well pled facts show that Mr. and Ms. Wright had an agreement to defame plaintiffs in order to obtain money and that this damaged plaintiffs.

---

[10] As noted above, the Court does not have personal jurisdiction over Ms. Wright and will deny the motion for default judgment with respect to her.  However, that does not prevent the well pled allegations of the complaint from establishing that she conspired with Mr. Wright.

*See* Docket No. 1 at 7, 13, ¶¶ 31, 95-97.  Accordingly, plaintiffs have pled each element

of a civil conspiracy against Mr. Wright and plaintiffs are entitled to default judgment on

this claim.

### H.  Permanent Injunction

Plaintiffs seek a permanent injunction

> enjoining D. Wright and K. Wright from further publication or disclosure of
> any type of AMG's confidential information as defined by the Employee
> Agreement and the Director Agreement; enjoining D. Wright and K.
> Wright from further disparagement of AMG, its officials, its directors, its
> employees, and its affiliates, in any forum; and requiring D. Wright and K.
> Wright to remove all mention of AMG, and its officers, directors,
> employees, and affiliates from the D. Wright Website, his personal
> LinkedIn social network site, and any posts he made to the LinkedIn
> social network to which he has access, and enjoining D. Wright and K.
> Wright from making any further posts about AMG, its officers, directors,
> employees, and affiliates.

Docket No. 18 at 4, ¶ 11.  Both the employee and director agreement allow injunctive

relief as a remedy for breach.  *See id.*, ¶¶ 12-13.  "To obtain a permanent injunction, a

plaintiff must show: '(1) actual success on the merits; (2) irreparable harm unless the

injunction is issued; (3) the threatened injury outweighs the harm that the injunction may

cause the opposing party; and (4) the injunction, if issued, will not adversely affect the

public interest.'"  *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (quoting *Sw.*

*Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009)).

Plaintiffs are entitled to default judgment against Mr. Wright on their breach of

contract, defamation, and conspiracy claims, and accordingly meet the element of

actual success on the merits.  *See Marche Design, LLC v. TwinPro Int'l Holdings Ltd.*,

2009 WL 37386, at *3 (D. Kan. Jan. 6, 2009) (finding success on the merits prong met

where plaintiff was entitled to default judgment on the claim).  The Court finds that

plaintiffs will be irreparably harmed unless defendants are barred from, *inter alia*, making other defamatory statements and releasing more confidential client information. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,* 633 F. Supp. 2d 1257, 1270 (D.N.M. 2008) (quoting *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511-12 (6th Cir. 1992)).  The injuries from these harms outweigh any interest defendants have in executing their vendetta against plaintiffs, and there is no harm to the public interest from the issuance of a permanent injunction.  *See Wagner Equip. Co. v. Wood*, 893 F. Supp. 2d 1157, 1161 (D.N.M. 2012) ("[O]nce a judge or jury has made a final determination that the speech at issue is defamatory, an injunction prohibiting the defendant from repeating the defamatory speech does not constitute a prohibited prior restraint on speech.").

However, the Court must consider whether Colorado law permits the entry of the permanent injunction plaintiffs seek.  The proceedings in *Harvey* are instructive.  In *Harvey II*, 200 F. App'x at 748-49, the plaintiffs sought the following permanent injunction:

> 1. Defendants shall not train or endeavor to train instructors or assistants in the same and/or similar methods, materials, techniques, trade secrets, and/or systems used by ISR;
> 2. Defendants shall not use and/or divulge, disclose or communicate, to any other person or entity of any kind or type, any of the methods, materials, techniques, trade secrets, and/or systems used by ISR;
> 3. Defendants shall not write for publication any article concerning the methods, materials, techniques, trade secrets, and/or systems used by ISR in its business and shall not participate in interviews with any person or entity of any kind or type concerning the methods, materials, techniques, trade secrets, and/or systems used by ISR;
> 4. Defendants shall not allow any ISR materials, documents and/or training videos to be copied, reproduced or replicated in whole or in part;

5. Defendants shall surrender to ISR all ISR materials, documents and/or training videos;
6. Defendants shall cease any and all utilization and/or association with the name ISR and/or Harvey Barnett, Inc.
7. Defendants shall not divert and/or attempt to divert away any employees, licensees, and/or instructors of ISR.

The district court granted the relief requested in paragraphs four, five, and six, but denied the relief requested in paragraphs one, two, three, and seven. *Id.* at 749. The district court, relying on Fed. R. Civ. P. 65(d), would not issue a vague or imprecise injunction on "the methods, materials, techniques, trade secrets, and/or systems used by [plaintiffs]." *Id.* (quotation marks omitted).[11] The Tenth Circuit affirmed the permanent injunction under an abuse of discretion standard of review, but stated that "the scope of the injunction arguably could have been broader in light of both the jury's general verdict that [two defendants] breached the license agreement's confidentiality provision and the evidence [plaintiffs] presented at trial." *Id.*

A party's promise to restrict his speech is enforced like any other agreement under state law. S*ee Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991). The terms of the employee and director agreements provide that injunction relief is available to enforce them. *See* Docket No. 18 at 4, ¶ 12. The Court has found that the confidentiality and non-disparagement provisions of the agreements are enforceable under Colorado public policy. *See supra* Section III.B.2. Accordingly, the Court finds that entering permanent injunctive relief to enjoin Mr. Wright from disclosing plaintiffs' confidential information aligns with Colorado public policy permitting the enforcement of

---

[11] The court denied the relief requested in paragraph seven on the grounds that it came from the covenant not to compete that plaintiff did not prevail on at trial. *Harvey II*, 200 F. App'x at 749.

the confidentiality agreement without a temporal limitation.  *See Harvey I*, 338 F.3d at 1133-34 (reversing grant of summary judgment in defendants' favor on breach of contract claim where contract prohibited disclosure of confidential information "during the term of this Agreement or after its termination").  Additionally, the Court finds that permanently enjoining Mr. Wright from disparaging plaintiffs comports with public policy. *See Pierce*, 981 P.2 at 601 (finding confidentiality and non-disparagement provisions in settlement agreement enforceable).

However, the scope of the permanent injunction sought is larger than what is prohibited by the employee and director agreements.  The agreements bar Mr. Wright from disclosing confidential information and disparaging AMG.  *See* Docket Nos. 2-1, 2-2.  But the permanent injunction plaintiffs propose prohibits Mr. Wright from ever mentioning AMG on his website or LinkedIn page.  *See* Docket No. 18 at 4, ¶ 11.  While a party's promise to restrict his speech is enforced like any other agreement under state law, *see Cohen*, 501 U.S. at 671, the employee and director agreements do not prohibit Mr. Wright from ever mentioning AMG online.  Additionally, the Court does not have jurisdiction over Ms. Wright and therefore cannot enter an injunction against her. Accordingly, the Court will grant plaintiffs' request for a permanent injunction in part. The Court will enjoin Mr. Wright from further publication or disclosure of AMG's confidential information as defined by the Employee Agreement and the Director Agreement, and enjoin Mr. Wright from further disparagement of AMG, its officials, its directors, its employees, and its affiliates.  The Court will deny the remainder of the request for a permanent injunction.

### I.  Damages

As damages, plaintiffs seek $32,019.00 in attorney fees "plus interest daily at the rate equal to the weekly average one-year constant maturity Treasury yield published by the Board of Governors of the Federal Reserve System for the calendar week preceding the date of the judgment, pursuant to 28 U.S.C. 1961 . . . ."  Docket No. 18 at 7, ¶ 25.  Local Rule 54.3(b) requires that a motion for attorney's fees shall include the following for each person for whom fees are claimed: (1) a summary of the relevant qualifications and experience; and (2) a detailed description of the services rendered, the amount of time spent, the hourly rate charged, and the total amount claimed. D.C.COLO.LCivR 54.3.

To determine the reasonableness of a fee request, a court must begin by calculating the "lodestar amount."  *Robinson v. City of Edmond,* 160 F.3d 1275, 1281 (10th Cir. 1998).  The lodestar amount is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *See Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983).  A "reasonable rate" is defined as the prevailing market rate in the relevant community for an attorney of similar experience.  *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.,* 295 F.3d 1065, 1078 (10th Cir. 2002).  A party seeking an award of attorney fees must establish the reasonableness of each dollar and each hour for which the party seeks an award.  *Jane L. v. Bangerter,* 61 F.3d 1505, 1510 (10th Cir. 1995).

Having reviewed the detailed billing records submitted by plaintiffs' attorney, Jonathan P. Fero, Docket No. 18-3, the Court finds that the hourly rates for attorneys Fero, Martin Semple, M. Brent Case, and Shannon Warren are reasonable given the

prevailing market rates for attorneys with similar experience.  In addition, the Court find that the hourly rates for paralegal Elaine Montoya and paralegal assistants Kathleen Schmidt and Steffie Cheng are reasonable.  However, the Court has not entered default judgment on each of plaintiff's claim.  The damages sought encompasses the fees for the entirety of this lawsuit, but it would be improper to award damages for the claims that the Court will not grant default judgment on.  Accordingly, the Court will deny the request for damages without prejudice and order plaintiffs to submit an additional motion for attorneys' fees that breaks out what time was spent on the claims for which the Court will award default judgment.

## IV.  CONCLUSION

Accordingly, it is

**ORDERED** that plaintiffs' Motion for Default Judgment [Docket No. 18] **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that default judgment is entered against Mr. Wright on the first, second, third, and sixth causes of action in the complaint.  It is further

**ORDERED** that Mr. Wright is enjoined from further publication or disclosure of AMG's confidential information as defined by the Employee Agreement and the Director Agreement and from disparagement of AMG, its officials, its directors, its employees, and its affiliates.  It is further

**ORDERED** that, within 21 days of the entry of this order, plaintiffs may submit a motion for attorneys' fees, breaking out which fees were incurred for the claims on which the Court has entered default judgment.  It is further

**ORDERED** that, within 30 days of the entry of this order, plaintiffs shall serve Ms.

Wright pursuant to Fed. R. Civ. P. 4.


DATED September 14, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge